UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

PAUL C. PRATT,                          )
       Plaintiff,                       )
                               )
       v.                               )          No. 2:03 CV 246
                               )
NiSOURCE, INC. and NIPSCO,               )
       Defendants.                      )

## OPINION and ORDER

This matter is before the court on a motion for summary judgment filed pursuant to FED.R.CIV.P. 56 by defendants NiSource, Inc. and NIPSCO ("defendants") on December 1, 2004. For the following reasons, this court shall grant defendants' motion.

## I. BACKGROUND[1]

Plaintiff Paul C. Pratt ("plaintiff"), an African-American, began working at NIPSCO, a natural gas and electric utility located in Northern Indiana, in the Spring of 1991. (Defs.' Appx., Ex. 6 – Deposition of Paul Pratt [hereinafter Pratt. Dep.], at 14-16). Plaintiff began his tenure at NIPSCO as a participant in an 18-month management trainee program. (Pratt Dep., at 14-16). Once the program ended, plaintiff accepted a full-time position as a Facilities Engineer in NIPSCO's Facility Management Department ("Facilities Department"). (Pratt Dep., at 21, 23-24). As a Facilities Engineer, plaintiff's responsibilities included managing internal building projects for approximately thirty NiSource facilities. (Pratt Dep., at 24-25).

In 1996, Nancy Hechlinski took over as Manager of the Facilities Department,

---

[1] The facts set forth in this section are undisputed.

and thus became plaintiff's supervisor. (Defs.' Appx., Ex. 7 – Deposition of Nancy Hechlinski [hereinafter Hechlinski Dep.], at 15).[2] As plaintiff's supervisor, Ms. Hechlinski, among other things, directly observed plaintiff's work performance and at least once a year reviewed with plaintiff the strengths and weakness of that performance by way of an Employee Performance Review. (*See* Defs.' Appx., Ex. 9 – Affidavit of Nancy Hechlinski [hereinafter Hechlinski Aff.], at attachments "A-E"). For example, in her 1998 review of plaintiff's performance, Ms. Hechlinski indicated that plaintiff needed to better manage and schedule his time and projects. (Hechlinski Aff., at attachment "A").

Sometime in 1999, a "Facilities Supervisor" working in plaintiff's department took an extended medical leave. (Hechlinski Dep., at 16). Accordingly, plaintiff (either voluntarily or pursuant to a request) took over that Facilities Supervisor's duties, including supervising the Facilities Department mechanics. (Hechlinski Dep., at 15-16; Pratt Dep., at 40-41). In her 1999 review of plaintiff's work performance, Ms. Hechlinski noted that plaintiff had some difficulty performing supervisory duties as those duties related to scheduling, organizing and time management. (Hechlinski Aff., at attachment "B"; *see also* Hechlinski Dep., at 20, 22-24). In any event, after a period of approximately three months, the Facilities Supervisor on medical leave returned to his position. (Hechlinski Dep., at 16- 17; Hechlinski Aff. ¶ 7). Plaintiff thus stopped performing most

---

[2] Before 1996, plaintiff reported to Mr. Randy Polster. (Pratt Dep., at 25-26). However, the time-frame relevant to the instant action includes only Ms. Hechlinski's reign as Manager of the Facilities Department.

supervisory duties and continued on in his position as Facilities Engineer, although, at

Ms. Hechlinski's request, plaintiff did retain supervisory responsibility over the

Facilities Department mechanics. (Hechlinski Dep., at 17-19)).

Also in 1999, some of plaintiff's "customers"[3] began complaining that they were

unhappy with plaintiff's management of projects in their departments. (Hechlinski

Dep., at 22-23). Ms. Hechlinski made note of these complaints in plaintiff's "file."

(Hechlinski Dep., at 22-24; Pl.'s Resp., at 4 ¶ 20). Shortly thereafter, Ms. Hechlinski

placed plaintiff on a three month Performance Improvement Plan in an effort to

improve plaintiff's scheduling and communication skills. (Pratt Dep., at 49-51, 55;

Hechlinski Dep., at 29-32). Pursuant to the Plan, Ms. Hechlinski met with plaintiff daily

for the first three to four weeks and then weekly thereafter to discuss scheduling and

time management. (Hechlinski Dep., at 29-30). The Performance Review Plan ultimately

ended in January of 2000 after being extended for two thirty day periods. (Hechlinski

Dep., at 31-32).

In April of 2000, plaintiff was temporarily moved to the Gary Operating Office to

assist with a Pole Replacement Program. (Pratt Dep., at 46, 61).[4] While working on that

---

[3] As already noted, plaintiff's responsibilities as a Facilities Engineer included managing internal building projects for NiSource facilities. (Pratt Dep., at 24-25, *see also* Defs.' Reply, at 7). Consequently, the term "customer," as used above, refers to those "internal NiSource 'customers' whom plaintiff serviced." (Defs.' Reply, at 7).

[4] In his deposition, plaintiff testified that he began the Gary Pole Project in April of 1999. (Pratt Dep., at 46). However, plaintiff clarified that his move to the Pole Project took place in 2000. (*See, e.g.*, Pl.'s Resp., at 16).

project, plaintiff retained the title of Facilities Engineer. (Pratt Dep., at 69). Plaintiff

remained on the project for approximately five months, but was then returned to the

Facilities Department in Hammond because, as plaintiff was told by Doug Spano (his

supervisor at the Gary Project), plaintiff was simply not getting enough "stuff" done.

(Pratt Dep., at 67-69).

Less than a year after returning from Gary to the Facilities Department in

Hammond, Ms. Hechlinski selected plaintiff to work as the fourth Project Coordinator

on a large Geographic Information System project. (Hechlinski Dep., at 35-36; Pratt

Dep., at 75-76). Plaintiff began his duties as Project Coordinator in July 2001, although

the official request to change plaintiff's title to Project Coordinator did not actually

occur until October of 2001. (Hechlinski Dep., at 37, 52, & attachment "1"). The position

ultimately required that plaintiff move to the Maps and Records Department located at

NiSource's corporate office in Merrillville, Indiana. When plaintiff arrived at the

Merrillville office, it was already occupied by three other persons who held the title of

Project Coordinator and some bargaining unit members. (Hechlinski Dep., at 38-40;

Def.'s Appx., Ex. 10 – Affidavit of Diane Buche [hereinafter Buche Aff.] ¶ 10). Because

the space was crowded, plaintiff, the newest addition to the space, was relegated to a

small cubicle. (Hechlinski Dep., at 38-39; Buche Aff. ¶ 11). Plaintiff remained in that

small cubicle until early 2002 when the space was reconfigured to hold an additional

full-sized cubicle. (Buche Aff. ¶ 15).

While plaintiff worked in the Merrillville office, his work was observed by Diane

4

Buche, the Manager of the Geographic Information System project. (Buche Aff. ¶ 32).[5]

At some point, Ms. Buche notified Ms. Hechlinski, who remained plaintiff's direct

supervisor, (Hechlinski Dep., at 46; Buche Aff. ¶ 32), that she believed plaintiff had

problems with timeliness and organization, and that plaintiff had failed to follow up on

tasks assigned to him, (Buche Aff. ¶¶ 16-32; Hechlinski Dep., at 46). Ms. Hechlinski

noted these apparent performance issues in plaintiff's 2002 Employee Performance

Review. (Hechlinski Aff., at attachment "E"). On January 14, 2002, Ms. Hechlinski met

with plaintiff to discuss the contents of his 2002 Review. (Pl.'s Resp., at 19; *see also*

Hechlinski Aff., at attachment "E"). Plaintiff indicated that he disagreed with his

negative performance rating and noted as much in the Employee Comments section on

the Review form. (Hechlinski Aff., at attachment "E").

Near the time – sometime in January – plaintiff was contesting his 2002

Employee Performance Review, Ms. Hechlinski's superior, James Haller, contacted Ms.

Hechlinski and informed her that, pursuant to a NIPSCO reorganization, she would

have to choose one position in her department for elimination. (Hechlinski Dep., at 72-

75; Hechlinski Aff. ¶ 9). Ms. Hechlinski was "quite sure" that she would recommend

plaintiff's position for elimination, but chose to review her files and the Employee

Performance Reviews for both plaintiff and another employee before informing Mr.

Haller of her decision. (Hechlinski Aff. ¶ 10; *see also* Hechlinski Dep., at 74-75). In the

---

[5] Ms. Buche also observed and managed the work of the three other Project
Coordinators in the Maps and Records Department. (Hechlinski Dep., at 46-47).

5

end, Ms. Hechlinski recommended plaintiff's position for elimination. (Hechlinski Dep., at 73; Hechlinski Aff. ¶ 11).[6] Plaintiff was ultimately notified about NIPSCO's reorganization and the elimination of his position on February 14, 2002. (Pratt Dep., at 93-94). Plaintiff thus concluded his time with NIPSCO on March 27, 2002. (Pratt Dep., at 111 ). Plaintiff's position was not replaced. (Pratt Dep., at 114; Hechlinski Aff. ¶ 11).

Plaintiff's termination, along with the events leading up to that termination, resulted in plaintiff filing a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 2, 2003. (*See* Defs.' Appx., Ex. 2). That charge was dismissed by the EEOC as untimely. (Defs.' Appx., Ex. 2). Six months later, on July 7, 2003, plaintiff filed a complaint with this court. In that complaint, plaintiff alleges that NiSource and NIPSCO discriminated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") by: (1) eliminating his position as the fourth Project Coordinator in the Maps and Records Department on account of his race; (2) denying him certain promotions and title changes (which would have entitled him to increases in salary) on account of his race; and, (3) temporarily assigning him to the smallest cubicle while he worked in the Maps and Records Department on account of his race. (*See generally* Pl.'s Compl.). Plaintiff amended his complaint on February 6, 2004, adding a claim under 42 U.S.C. § 1981. (*See generally* Pl.'s Am. Compl.). Pursuant

---

[6] Although plaintiff's position was the only position eliminated in his particular department, NIPSCO's reorganization caused the termination of eight other employees, none of whom were African-American. (Defs.' Appx., Ex. 8 – Affidavit of Joseph Skvarek [hereinafter Skvarek Aff.] ¶ 9).

to a stipulation filed on March 26, 2004, plaintiff's Title VII claim was dismissed with prejudice. Thus, all that remains pending in this action are plaintiff's claims under § 1981[7].

On December 1, 2004, defendants filed the motion for summary judgment now at issue before this court. Plaintiff filed his response to defendants' motion on January 3, 2005, and defendants replied in appropriate fashion on January 18, 2005. As this matter has been fully briefed, this court shall now address the merits of defendants' motion.

## II. STANDARD OF REVIEW

Summary judgment is a flexible procedural device which allows district courts to dispose of all or any portion of an action for which a trial is superfluous. *See* FED.R.CIV.P. 56, at Advisory Comm. Notes, 1937 Adoption ("Summary judgment procedure is a method for promptly disposing of actions in which there is no genuine issue as to any material fact."). RULE 56 of the FEDERAL RULES OF CIVIL PROCEDURE governs the summary judgment process and requires that summary judgment be rendered "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue* as to any *material fact* and that the moving party is entitled to a *judgment as a matter of law.*" FED.R.CIV.P. 56(c) (emphasis added); *accord Gordon v. United Airlines*, 246 F.3d 878,

---

[7] Section 1981 proscribes discrimination based on race and ethnicity in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981.

885 (7th Cir. 2001) ("A grant of summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."). More simply put, FED.R.CIV.P. 56 mandates an approach in which summary judgment is proper only if there is no reasonably contestable issue of fact that is potentially outcome-determinative. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997).

When considering a motion for summary judgment, the court views all inferences in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). However, the non-moving party may not rely upon mere allegations, but must present specific facts to show that a genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Although courts weighing summary judgment motions in employment cases must take special care not to invade the province of the fact finder, employment cases are governed by the same rules that govern other summary judgment cases, and they are equally amenable to summary disposition so long as there is no genuine dispute as to material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## III. ANALYSIS

As an initial matter, all parties to the instant action have recently agreed that

NiSource, a publicly-held holding company with no employees, is not a proper defendant to this § 1981 action. (Defs.' Summ. J. Mem., at 8; Pl.'s Resp. at 14 n. 4). Therefore, summary judgment is clearly appropriate with regard to all plaintiff's claims against NiSource. Accordingly, the following analysis shall deal with each of plaintiff's claims as they relate to NIPSCO.

Plaintiff can prove his § 1981 case against NIPSCO either by presenting direct evidence of discriminatory intent, or by using the indirect, burden-shifting method of proof first elaborated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir. 1993). In the instant action, plaintiff does not offer any direct evidence of discriminatory intent on any of his claims. Thus, plaintiff must rely on the burden-shifting method of proof.

*McDonnell Douglas* generally requires that a plaintiff "present evidence on four prongs to make a *prima facie* case." *Michas v. Health Cost Controls, Inc.* 209 F.3d 687, 693 (7th Cir. 2000). The traditional or very typical *prima facie* case in a discriminatory termination action calls for a plaintiff to demonstrate that: "(1) he is a member of a protected class, (2) he reasonably performed to his employer's expectations, (3) he was subject to an adverse employment action and (4) the position remained open." *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802). Of course, because there exists a "variety of adverse employment actions covered within the broad reach of the discrimination statutes, [the Seventh Circuit has] adapted the requirements for making a *prima facie* case in special cases to reflect the reality of the workplace." *Id.* (citation omitted). Consequently, this

court shall review each of plaintiff's allegations of discrimination within the context of the appropriate four-pronged *prima facie* test. Once plaintiff establishes a *prima facie* case, "the burden of production shifts to [defendants] to articulate a legitimate, nondiscriminatory reason for [their] allegedly biased employment decision." *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir. 1996) (citations omitted). If defendants meet their burden, then plaintiff must, in order to prevail, demonstrate by a preponderance of the evidence that defendants' stated reasons for executing the challenged employment decision are nothing more than pretext (i.e., lies) for discrimination. *See id.* (citations omitted).

A. *Discriminatory Termination*

In his complaint, plaintiff first alleges that defendants' decision to eliminate his position as Project Coordinator in the Maps and Records Department was based solely upon the fact that plaintiff is an African-American. (Pl.'s Am. Compl. ¶¶ 9-10). Defendants counter that plaintiff was not terminated because of his race, but rather that plaintiff's termination was the ultimate result of a Reduction-in-Force ("RIF")[8]. (Defs.' Summ. J. Mem., at 10-11). More specifically, defendants argue that company downsizing and budget cuts generally required that NIPSCO eliminate a certain number of employee positions; and thus, defendants chose to eliminate plaintiff's position because, according to defendants, plaintiff had consistently failed to meet

---

[8] "A RIF occurs when an employer permanently eliminates certain positions from its workforce." *Michas v. Health Cost Controls, Inc.* 209 F.3d 687, 693 (7th Cir. 2000) (citation omitted).

10

defendants' legitimate employment expectations. (Defs.' Summ. J. Mem., at 8-11).

      1. *Prima Facie* Case[9]

To establish a *prima facie* case in a RIF action, a plaintiff must produce evidence demonstrating that: (1) he was a member of a protected class; (2) he was qualified for the job in question or was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and, (4) the employer treated similarly situated persons not in the protected class more favorably. *See Lalvani v. Cook County*, 269 F.3d 785, 789 (7th Cir. 2001). Defendants concede that plaintiff can establish both the first and third elements of his *prima facie* case. (Defs.' Summ. J. Mem., at 8). Consequently, the court shall not discuss those elements, but rather shall discuss only the second and fourth elements which, respectively, require plaintiff to demonstrate that he was meeting defendants' legitimate employment expectations and that similarly situated persons not in plaintiff's protected class were treated more favorably.

---

[9] Plaintiff argues that this court must simultaneously review plaintiff's *prima facie* case and the issue of pretext where, as in the instant action, the issue of plaintiff's satisfactory job performance focuses on the same circumstances as those that must be scrutinized with respect to the matter of pretext. (Pl.'s Resp., at 18). However, while it undoubtedly seems a "sensible shortcut," in cases such as this one, to combine the *prima facie* analysis concerning a plaintiff's job performance with the pretext inquiry, this Circuit nonetheless "does not endorse such a practice." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002). Rather, the Seventh Circuit "has consistently held that 'the prima facie case under *McDonnell Douglas* must be established and not merely incanted.' " *Id.* at 327 (quoting *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178 (7th Cir. 1997)). "If a plaintiff is unable to establish a *prima facie* case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry. *Id.* (citations omitted).

a. <u>Legitimate Expectations</u>

In their motion for summary judgment, defendants argue that the decision to eliminate plaintiff's position of employment during NIPSCO's RIF was made based upon plaintiff's failure to meet NIPSCO's legitimate employment expectations. (Defs.' Summ. J. Mem., at 8-10). In support of their claim, defendants cite to plaintiff's January 2002 Employee Performance Review, which reports that plaintiff had difficulty with scheduling projects and managing his time, (Hechlinski Aff., at attachment "E"), and to Ms. Buche's affidavit, which states that plaintiff often failed to meet deadlines and to complete projects satisfactorily while working as a Project Coordinator in the Maps and Records Department, (Buche Aff. ¶¶ 16, 17, 20, 22, 25-31).[10] Plaintiff, in turn, counters that his negative 2002 Employee Performance Review was ultimately a result of Ms.

---

[10] Defendants also submit other employee performance reviews, (*see, e.g.,* Hechlinski Aff., at attachments "A-D"), deposition testimony, (*see, e.g.,* Hechlinski Dep.), and affidavits, (*see, e.g.,* Hechlinski Aff.), each of which describe, recite or recount some deficiency in plaintiff's work performance throughout his tenure at NIPSCO. However, plaintiff takes issue with the evidence provided by defendants that dates back at least a few years before his actual termination took place. (Pl.'s Resp., at 14). Plaintiff argues that "for purposes of establishing a *prima facie* case of discrimination, the inquiry is not whether the employee was meeting the employer's expectations at any time, but rather whether he was meeting the employer's expectations at the time he was terminated." (Pl.'s Resp., at 14 (citing *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 545-46 (7th Cir. 2002)). It is certainly true that a plaintiff's performance just before termination is the most relevant to a *prima facie* inquiry such as the one at hand. *See Childress v. Arcata Graphics Co.,* 782 F. Supp. 397, 404 n.10 (N.D. Ill. 1992). Accordingly, the court shall ultimately limit its focus, for the moment, to plaintiff's performance directly before he was terminated.

Hechlinski's "attitude" toward plaintiff, (*see* Pl.'s Resp., 18-19),[11] and that he in fact was

fulfilling all his job responsibilities as Project Coordinator and meeting all goals and

project deadlines, (Pratt Dep., at 91; *see also* Hechlinski Aff., at attachment "E"

(Employee Comments Section)).

In the context of a *prima facie* inquiry, a plaintiff's own testimony concerning the

adequate quality of his work is sufficient to demonstrate that the plaintiff was

performing a job well enough to meet an employer's legitimate expectations, *see*

*Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 923 n.6 (7th Cir. 1988) ("A

determination that an individual is performing a job well enough to meet an employer's

legitimate expectations, when made in the context of a prima face case, may be based

solely upon the employee's testimony concerning the quality of his work."); such is the

---

[11] Plaintiff also asserts that his January 14, 2002 Employee Performance Review was written up only after Ms. Hechlinski "already knew she was planning to terminate [plaintiff]." (Pl.'s Resp., at 19). Interestingly, plaintiff does not cite to *any* evidence that might support this assertion. Perhaps plaintiff makes this argument because, as defendants point out, Ms. Hechlinski has testified that she was informed about the need to eliminate a position in her department (pursuant to NIPSCO's RIF) "in the earlier party of January [2002]." (Defs.' Reply, at 7 n.7 (citing Hechlinski Dep., at 75)). While plaintiff's argument may be fleetingly intriguing, it is nothing more. The record simply does not support plaintiff's speculation on the timing of his Review and termination. The record ultimately reflects that Ms. Hechlinski prepared her 2002 Review of plaintiff's performance throughout the course of the year preceding the final review on January 14, 2002. Indeed, plaintiff's initials appear on the Review form next to the dates "6/15/01" and "9/18/01" indicating that not only was plaintiff's Review in progress before January 2002, but also that he had been privy to some portions of that Review before Ms. Hechlinski was ever informed about NIPSCO's RIF. (*See* Hechlinski Aff., at attachment "E"). Moreover, Ms. Hechlinski states quite clearly in her affidavit that she was not aware that plaintiff's position would be eliminated when she prepared plaintiff's 2002 Employee Performance Review or when she conducted the Review with him on January 14, 2002. (Hechlinski Aff. ¶ 12).

case "even though without the slant required by FED.R.CIV.P. 56 such evidence may not look terribly persuasive." *Childress v. Arcata Graphics Co.,* 782 F. Supp. 397, 404 (N.D. Ill. 1992) (citation omitted). Accordingly, plaintiff's own testimony that he was performing his job well, making deadlines, etc., is enough to establish the "legitimate expectations" prong of his *prima facie* case. Nonetheless, the court notes that plaintiff's "same self-serving testimony cannot alone ultimately forestall summary judgment." *Id.* (citation omitted).

### b. Similarly Situated Persons

Next, this court turns to the issue of whether plaintiff has met the fourth element of his *prima facie* case which requires that plaintiff demonstrate NIPSCO treated similarly situated persons not in the protected class more favorably. *See Lalvani,* 269 F.3d at 789. Plaintiff argues that "he does not have to show [this element]," because such an element need only be shown in a typical RIF action, which, according to plaintiff, this case is not. (Pl.'s Resp., at 17). Plaintiff ultimately suggests that his case presents a "mini-RIF." (Pl.'s Resp., at 17).

In a typical mini-RIF action, "a single employee is discharged and his position is not filled," yet his responsibilities "are assumed by other members of the corporate workforce." *Michas,* 209 F.3d at 693 (citation omitted). Out of "fear that employers might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job," the Seventh Circuit has, in mini-RIF actions, "dispensed with the requirement that the plaintiff show 'similarly situated' employees who were treated more favorably." *Id.* "Instead, because [in a mini-

RIF situation] the fired employee's duties are absorbed by other workers and the employee was replaced, not eliminated," the Seventh Circuit only requires "that a plaintiff demonstrate that his duties were absorbed by employees who were not members of the protected class." *Id.* (internal quotation marks and citation omitted).

Plaintiff argues that his termination must be treated as a mini-RIF because, although NIPSCO's reduction in force ultimately resulted in the elimination of eight other positions company-wide, (*see* Defs.' Summ. J. Mem., at 5), he was the *only* one eliminated from the Maps and Records Department, (Pl.'s Resp., at 17). In other words, plaintiff appears to argue that his position was unique and should be treated as such. Perhaps this is so, however, it matters little whether this court analyzes plaintiff's termination claim under the elements of a RIF or mini-RIF *prima facie* case in as far as it appears plaintiff cannot meet his burden on the fourth element of either.

First, were this court to treat this as a traditional RIF case, then, as noted above, plaintiff would be required to demonstrate that defendants treated similarly situated persons not in the protected class more favorably. *See Lalvani*, 269 F.3d at 789. However, because plaintiff states that he "does not have to show this," and therefore fails to make any argument or present any evidence concerning this element, plaintiff clearly fails to demonstrate the fourth prong of a *prima facie* case in a typical RIF action. Second, should this court treat this action as a mini-RIF case, then plaintiff would have to establish that his responsibilities as Project Coordinator in the Maps and Records Department have been absorbed by other employees not within plaintiff's protected class. *See Michas*, 209

F.3d at 693. Yet, this he does not do. Although plaintiff states that when he was terminated, "his Project Coordinator duties were absorbed by the other three Project Coordinators, none of whom is African-American," (Pl.'s Resp., at 17), he fails to provide *any* support for such a statement (he does not even cite to his own affidavit or deposition), and there is no other evidence in the record that would suggest his responsibilities were indeed assumed by others.[12]

Ultimately, it is well established that a party will be successful in opposing summary judgment *only* when it presents definite, competent evidence to rebut the motion. *See, e.g., Smith ex rel. Smith v. Severn,* 129 F.3d 419, 426-27 (7th Cir. 1997). While it is the Court's responsibility to determine if genuine issues of material fact exist, "[t]he parties . . . bear a concomitant burden to identify the evidence that will facilitate this assessment." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994); *accord United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Therefore, as plaintiff fails to point to any evidence establishing either that there existed similarly situated employees outside his protected class that were treated more favorably or that his duties were absorbed by employees outside his protected class, he fails to make out a *prima facie* case under the traditional RIF or mini-RIF framework; this is fatal on summary judgment.

_____

[12] It seems to this court that, in most instances, it is difficult to have personal knowledge of what happens to one's job duties or responsibilities (i.e.,whether those duties were absorbed at all, and if they were, whether they were mostly absorbed by members outside of one's own protected class, etc.) after one is terminated from his position and no longer present at his place of employment.

16

### 2. Pretext

As this court has concluded that plaintiff has failed to establish a *prima facie* case, it is not necessary for this court to further analyze plaintiff's claim of discriminatory termination under the *McDonnell Douglas* scheme. *See Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir. 1997). Nevertheless, this court desires to make clear that even if it assumes the existence of a *prima facie* case, the evidence in the record does not create genuine issues of material fact necessitating a trial. Thus, assuming, *arguendo*, that plaintiff carried his initial *prima facie* burden, this court shall continue with its analysis of plaintiff's claim of discriminatory termination under the *McDonnell Douglas* burden-shifting method.

Under *McDonnell Douglas*, once a plaintiff establishes a *prima facie* case, the burden shifts back to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *Johnson,* 91 F.3d at 931. This burden is merely one of production and not one of persuasion. *Williams,* 856 F.2d at 922. Defendants assert that plaintiff's position of employment was eliminated pursuant to a RIF which was implemented "as part of an effort to standardize operations, consolidate local operating areas and gain other operating efficiencies . . ." (Defs.' Summ. J. Mem., at 11; Defs.' Reply, at 4). More specifically, defendants contend that plaintiff's position was selected for elimination under NIPSCO's RIF because plaintiff's supervisor, Ms. Hechlinski, believed plaintiff to be the "poorest performer" in her department. (Defs.' Summ. J. Mem., at 11). According to evidence submitted by defendants, Ms. Hechlinski based her

17

view of plaintiff's performance, at least in part, upon her own observations of plaintiff's difficulties with: (1) scheduling; (2) managing his time; (3) being accountable and informing his co-workers where he was when he left the office; and, (4) remaining in the office when plaintiff's duties did not require him to be away. (*See* Hechlinski Dep., at 20, 22-25). Defendants also submit, as evidence of plaintiff's poor work performance, several negative Employee Performance Reviews, (*see* Hechlinski Aff., at attachments "A-E"), information on complaints made by NiSource customers[13] concerning plaintiff's work performance, (*see* Hechlinski Dep., at 22-23), comments made by plaintiff's supervisor on the Gary Pole Project that plaintiff was not getting enough work done while in Gary, (Pratt Dep., at 67-69), and comments made by Ms. Buche regarding plaintiff's failure to meet deadlines and his inability to complete projects satisfactorily while working in the Maps and Records Department, (Buche Aff. ¶¶ 20, 22, 25-30).

By arguing simply that plaintiff's poor performance record made his position the most suitable for elimination in NIPSCO's RIF, defendants have met their burden of articulating a legitimate, nondiscriminatory reason for terminating plaintiff. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1291 (7th Cir. 1997) (employer who proffered that it fired employee based upon poor work performance evaluation articulated a legitimate, non-discriminatory reason); *Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) (defendant met its burden of producing admissible evidence of a legitimate, nondiscriminatory reason for firing plaintiff when it argued that plaintiff's

---

[13] *See supra* note 3.

18

poor performance made him expendable when RIF took place); *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir. 1992) (supervisor's belief that plaintiff was poor performer was legitimate, nondiscriminatory reason for plaintiff's termination). Indeed, "for a reason to be 'legitimate,' in the sense of sufficient to rebut a prima facie case, it need not be a good or sympathetic justification for what the employer did; it need only be nondiscriminatory and . . . explain why the challenged action was taken." *Timm v. Mead Corp.*, 32 F.3d 273, 275 (7th Cir. 1994) (citation omitted); *accord Bd. of Trustees v. Sweeney,* 439 U.S. 24, 25 (1978) (defendant need not prove that the reason for termination was nondiscriminatory, but only needs to articulate some legitimate reason for the termination). Therefore, in order to survive summary judgment, plaintiff must now raise a genuine issue of fact as to whether defendants' stated reasons for terminating him are merely pretext for race-based discrimination. *See Johnson,* 91 F.3d at 931.

Pretext "means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's track's." *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 684 (7th Cir. 2000) (citation omitted). An employee may make a showing of pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989) (internal quotation marks and citation omitted). Plaintiff lacks direct evidence of discriminatory motive on the part of

19

defendants. However, plaintiff does expend a great deal of effort (and briefing space) addressing the truth of defendants' report on plaintiff's poor performance. By attacking the validity of defendants' evidence that plaintiff performed poorly, plaintiff clearly seeks to show that  defendants' decision to eliminate his position as part of the RIF (on account of his poor performance) is unworthy of credence. To demonstrate that defendants' reasons for terminating plaintiff are unworthy of credence, plaintiff must show: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge *or* (3) that they were insufficient to motivate discharge." *Id.* (internal quotation marks and citation omitted) (emphasis in original).

Plaintiff begins his discussion on pretext by addressing defendants' argument that plaintiff had "scheduling" problems. Plaintiff first contends that he was never made aware that such problems existed. (Pl.'s Resp., at 14-15). However, the court finds plaintiff's argument difficult to believe in light of the evidence submitted. Indeed, "scheduling" was discussed as an "area for improvement" on plaintiff's 1999 and 2000 Employee Performance Reviews; and, plaintiff's signature appears on each of those Reviews, thus suggesting that plaintiff was in fact aware that Ms. Hechlinski viewed "scheduling" as a problem area for plaintiff, (*see* Hechlinski Aff., at attachments "B" & "C").

Plaintiff also argues that the only time he ever had any responsibility for scheduling was when he filled in for a Supervisor in the Facilities Department who was

20

out of the office on medical leave. (Pl.'s Resp., at 15).[14] Yet, the evidence does not support plaintiff's "I only had one scheduling project" argument in as far as plaintiff testified that upon beginning his tenure with NIPSCO, (and thus before he took on any supervisory duties in the Facilities Department), part of his duties as Facilities Engineer included "scheduling work." (Pratt Dep., at 24). In any event, even if plaintiff only ever had one scheduling project, he fails to elaborate upon the import of such a fact. Unfortunately for plaintiff, numbers – one scheduling task versus dozens - are not what is relevant here. Rather, the relevant pretext inquiry is whether Ms. Hechlinski honestly believed that plaintiff had a scheduling problem. *See McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.").

Ultimately, the fact that plaintiff may have had only one scheduling task versus dozens or even hundreds does not call into question Ms. Hechlinski's belief as to plaintiff's particular performance on that one scheduling task. Stated another way, just because plaintiff argues that he had only one scheduling task, it does not follow that Ms. Hechlinski could not have honestly believed that plaintiff had a scheduling

---

[14] Plaintiff states that once he took on certain supervisory duties in the Facilities Department he gained the responsibility of scheduling NIPSCO's mechanics into eight-hour shifts. (Pl.'s Resp., at 14-15).

problem, especially if he had performed that one task poorly.[15] Therefore, plaintiff's assertion that he only had one scheduling duty does not create a disputed fact question material to pretext.

Moving on from scheduling, plaintiff next attacks defendants' allegation that plaintiff had issues with timeliness. Plaintiff contends that Ms. Hechlinski only once asked him to spend more time at the office. (Pl.'s Resp., at 16). Moreover, plaintiff notes that, while filling in for the Supervisor on medical leave in the Facilities Department, he often had the responsibility of visiting other job sites to check on buildings and employees. (Pl.'s Resp., at 16). Accordingly, plaintiff argues "this does not sound like timeliness was a real issue for [him]." (Pl.'s Resp., at 16).

However, whether timeliness "sounds" like an issue to plaintiff matters little. Again, the relevant pretext inquiry here concerns Ms. Hechlinski honest belief as to plaintiff's performance problems. *See McCoy*, 957 F.2d at 373. Plaintiff does not identify any evidence that generates any doubt as to the honesty of Ms. Hechlinski's belief that plaintiff had issues with timeliness. Instead, plaintiff buoys the honesty of Ms. Hechlinski's belief by readily admitting that Ms. Hechlinski, on at least one occasion, approached him with concerns about the amount of time plaintiff spent out of the

---

[15] Interestingly, plaintiff does *not* assert that he *did not* have difficulty performing the one and only scheduling task that he alleges he had responsibility for. Rather, by noting that he had never had any training concerning scheduling and that he had a lot of responsibility while performing supervisory duties in the Facilities Department, plaintiff appears to suggest that there may have indeed been some deficiencies in his scheduling performance. (*See* Pl.'s Resp., at 4 ¶ 20, 15).

office. (Pl.'s Resp., at 16). In any event, even if Ms. Hechlinski were wrong in her belief that plaintiff left the office when his job duties did not require it – and, in fact plaintiff was out of the office visiting job sites – it would matter little because, in order to show pretext, plaintiff would have to produce evidence that evaluation of his performance was dishonest, not merely mistaken, *see Mills v. Health Care Service Corp.*, 171 F.3d 450, 459 (7th Cir. 1999), and this he does not do. Accordingly, plaintiff fails to raise an issue of fact concerning the validity of defendants' assertion that plaintiff had problems with timeliness.

Next, plaintiff takes issue with his "below average" Employee Performance Reviews. Plaintiff argues that his Reviews were only below average because of what he "sensed" as Ms. Hechlinski's "attitude" towards him as an African-American. (Pl.'s Resp., at 19 (citing Pratt Dep., at 38-42)). Unfortunately for plaintiff, his personal "sense" as to Ms. Hechlinski's attitude is not evidence; and even if it were, a conclusory assertion such as the one presented by plaintiff – that Ms. Hechlinski's alleged attitude towards plaintiff caused his negative evaluations – does not, without more, create an issue of fact. *See Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 843 (7th Cir. 1996) ("[C]onclusory statements in the plaintiff's affidavit or deposition do not create an issue of fact.").

Plaintiff also argues that, although he did not document, in writing, his

disagreement with his Employee Performance Reviews every year,[16] he did verbally

voice his disagreement with those evaluations to Ms. Hechlinski. (Pl.'s Resp., at 5 ¶ 21).

Plaintiff seemingly suggests here that his disagreement with his Employee Performance

Reviews (somehow) renders those Reviews bogus. Yet, to demonstrate pretext, a

plaintiff must do more than simply "challenge the judgment of [his] superiors through

[his] own self-interested assertions because the employee's perception of [himself] . . . is

not relevant. It is the perception of the decision maker which is relevant." *First Fed. Sav.

& Loan Ass'n*, 83 F.3d at 843 (internal quotation marks and citation omitted); *accord

Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) ("An

employee's self-serving statements about his ability . . . are insufficient to contradict an

employer's negative assessment of that ability.").

Finally, as it relates to his Employee Performance Reviews, plaintiff asserts that

his January 2002 performance evaluation – the evaluation closest in time to his

termination – is itself evidence of pretext because, he argues, it was performed after the

decision to fire him had already been made. (Pl.'s Resp., at 19). As the court has already

noted above in footnote 5 of this Order, the record simply does not support plaintiff's

speculations on the timing of his January 14, 2002 Review and subsequent termination.

Accordingly, plaintiff has failed to raise an issue of fact with regard to the validity of his

negative Employee Performance Reviews.

---

[16] Plaintiff did document (in writing) his disagreement with his January 2002
employment performance rating. (*See* Hechlinski Aff., at attachment "E").

24

Plaintiff next challenges the validity defendants' assertion that NiSource customers[17] made complaints against him. Plaintiff readily admits that the complaints do exist, however, he argues that the complaints were not excessive. (Pl.'s Resp., at 15). Yet, whether the complaints were excessive or not, is not an issue of material fact with regard to pretext. Ultimately, the fact that such complaints do exist lends credence to Ms. Hechlinski's belief that plaintiff was the worst performer in her department, and thus, that his position was expendable in NIPSCO's RIF.

Finally, plaintiff takes issue with complaints made by Mr. Spano and Ms. Buche regarding his performance on the Gary Pole Project and his performance as Project Coordinator in the Maps and Records Department, respectively. Plaintiff does not dispute that the complaints were made, rather he argues that they are not valid. (*See* Pl.'s Resp., at 16). As to Mr. Spano's complaint that plaintiff was not getting enough work done while in Gary, (*see* Pratt Dep., at 67-69), plaintiff alleges that he did indeed complete his portion of the work and that it was not due to any performance problems on his part that poles were not actually installed, (Pl.'s Resp., at 16; Pratt Dep., at 65-68). As concerns comments made by Ms. Buche on plaintiff's failure to meet deadlines and his inability to complete projects satisfactorily while working in the Maps and Records Department, (*see* Buche Aff. ¶¶ 20, 22, 25-30), plaintiff states that he believes he had met all his goals and deadlines, (Pl.'s Resp., at 16; Pratt Dep., at 91). However, plaintiff's self-interested assertions that he "did to" finish his portion of the pole project and that he

---

[17] *See supra* note 3.

"did to" meet all his goals and deadlines in the Maps and Records Department are simply not enough to establish an issue of fact regarding the validity of Mr. Spano's and Ms. Buche's complaints. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 262-63 (7th Cir. 1998) ("Self-serving statements do not shed any light on whether the employer honestly based its employment decision on performance-related considerations, which is the focus of our inquiry in these cases."); *Williams,* 856 F.2d at 924 (employee's self-interested assessment of her own job abilities are insufficient to raise an issue of fact in pretext context).

In sum, plaintiff's presentation of self-interested assertions, conclusory statements, and non-material facts falls far short of convincing this court that defendants' proffered reasons for selecting plaintiff's position for elimination in NIPSCO's RIF are unworthy of credence. Therefore, even assuming that plaintiff has established a *prima facie* case of discriminatory termination, summary judgment nonetheless remains appropriate. *See Johnson,* 91 F.3d at 931. Consequently, this court hereby grants defendants' motion for summary judgment as it relates to plaintiff's claim that defendants wrongfully eliminated plaintiff's position of employment based upon plaintiff's race in violation of § 1981.

B. *Failure to Promote and Provide Appropriate Title Changes*

In his amended complaint, plaintiff next alleges that defendants denied him several changes in job titles on account of his race. (Pl.'s Compl. ¶ 7). Plaintiff points to three specific occasions on which he believes he should have received a title change

26

from one job position to another but did not: (1) December of 1998 – from Facilities Engineer to Facilities Supervisor;[18] (2) April 2000 – from Facilities Supervisor to Project Engineer; and, (3) July 2001 – from Facilities Engineer to Project Coordinator. (*See* Pl.'s Resp., at 20-21). Plaintiff contends that each of the above title changes constituted a promotion, and therefore, had he been given those title changes, he would have also received a salary increase.

      1. *Prima Facie* Case

In a typical failure to promote case, a plaintiff must show that: (1) he was a member of a protected group; (2) he applied and was qualified for the position sought; (3) he was rejected for the position; and (4) the position was granted to a person outside of the protected group who was not better qualified. *Grayson v. City of Chicago,* 317 F.3d 745, 748 (7th Cir. 2003). The court notes however, that this is not a "typical" failure to promote case. Ultimately, it does not appear that NIPSCO, on any of the three occasions on which plaintiff believed he should have received a title change, ever engaged in an actual search for the appropriate employee to fill an open position. Rather, as will be explained below, this action appears to involve three somewhat "unique" failure to promote scenarios. Thus, this court shall tailor its *prima facie* inquiry accordingly.

---

[18] In his answers to defendants' interrogatories, plaintiff stated that defendants failed to promote him from Facilities Engineer to Facilities Supervisor in December of 1999. (Defs.' Appx., Ex. 11 – Pl.'s Resp. to Defs.' First Set of Interrogs., at Answ. # 5). However, in his deposition, plaintiff clarified that this alleged failure to promote actually took place in December of 1998. (Pratt Dep., at 142).

a.  Failure to Promote from Facilities Engineer to Facilities
Services Supervisor

Plaintiff first alleges that although he was performing the supervisory duties of a

Facilities Supervisor in December of 1998, he never actually received the Facilities

Supervisor title. Consequently, plaintiff argues, he never received the monetary raise

(allegedly) accompanying such a title. (Pl.'s Resp., at 20). Defendants counter that this

allegation is untimely as it falls outside the applicable statute of limitations. (Defs.'

Summ. J. Mem., at 12).

Plaintiff's claims are subject to the federal four year statute of limitations for civil

actions arising under Acts of Congress found in 28 U.S.C. § 1658(a)[19]. *See Jones v. R.R.

Donnelley & Sons*, 541 U.S. 369 (2004) (discussing generally the applicability of § 1658's

four year statute of limitations to claims of discrimination arising under § 1981); *Dandy*

*v. United Parcel Service, Inc.*, 388 F.3d 263, 269 (7th Cir. 2004) (finding that failure to

promote claims brought under § 1981 are covered by the four year statute of limitations

in § 1658). As plaintiff filed his complaint on June 17, 2003,[20] any claims made by

plaintiff concerning events occurring before June 17, 1999 fall outside the applicable 4

---

[19] Section 1658(a), which was enacted in 1990, provides:

Except as otherwise provided by law, a civil action arising under an Act of
Congress enacted after the date of enactment of this section may not be
commenced later than 4 years after the cause of action accrues.

[20] As the  § 1981 claim newly set forth in plaintiff's amended complaint clearly
"arose out of the conduct, transaction, or occurrence set forth or attempted to be set
forth in the original pleading," this court uses the filing date of plaintiff's original
complaint versus the date he filed his amended complaint. FED.R.CIV.P. 15(c)(2).

28

year statute of limitations. *See* 28 U.S.C. § 1658(a). Thus, plaintiff's claim that he failed to receive a proper promotion and title change in December of 1998 is untimely, and this court need not consider it.

> b.   Failure to Promote From Facilities Services Supervisor to Project Engineer

Plaintiff next alleges that defendants failed to promote him from Facilities Supervisor[21] to Project Engineer while he worked on the Gary Pole Project in April of 2000. (Pl.'s Resp., at 21). On the pole project, plaintiff was assigned to the Utilities Services Department where "other" employees held the title of "Project Engineer." (Pl.'s Resp., at 21). Plaintiff states that although he "understood" he too would be a "Project Engineer," he never actually received such a title. (Pl.'s Resp., at 21). Thus, plaintiff argues, he never became eligible for the (alleged) salary increase that accompanied a title change from Facility Engineer to Project Engineer. (Pl.'s Resp., at 21).

The fact that plaintiff simply "understood" – i.e., subjectively believed – he would receive a title change means very little in the context of this *prima facie* inquiry.

---

[21] Defendants contend that plaintiff never held the title of Facilities Supervisor (the title plaintiff alleges he should have received in December of 1998). Rather, defendants assert that at the time plaintiff was sent to assist on the Gary Pole Project, he actually held the title of Facilities Engineer. (Defs.' Summ. J. Mem., at 11 n.5). Plaintiff does not clarify in his response what title he in fact believed he held before moving to Gary. However, in his final failure to promote claim (which will be discussed shortly in Section II(B)(1)(c) below) plaintiff argues that he should have been promoted from Facilities Engineer to Project Coordinator; and, considering that the events underlying this final claim took place after plaintiff returned from the Gary Pole Project, it certainly seems as if plaintiff's title before transferring to that project was Facilities Engineer. In any event, for the particular purposes of the following discussion, it matters little what plaintiff's title was before he was assigned to the Gary Pole Project.

*See First Fed. Sav. & Loan Ass'n*, 83 F.3d at 841-42 ("[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed."). Indeed, it is not clear here that, outside of the "understanding" apparently formed in plaintiff's mind, there ever even actually existed a Project Engineer position for plaintiff to fill. Even if there did exist such a position, it is not clear that plaintiff's "understanding" translated into an active attempt to achieve that title change. If there was not actually a position open, or plaintiff did not seek it (beyond some subjective belief that he should receive it), then plaintiff certainly did not suffer an adverse employment action here.

Even assuming for a moment that there did exist a position and that plaintiff actively sought that position out, the fact that "others" in the Utilities Services Department held the title of Project Engineer does not automatically mean that plaintiff was qualified or deserving of such a position. Plaintiff ultimately fails to allege, let alone present any evidence, that he was actually comparable in skill, ability, duties, responsibilities, tenure, etc. to those "others;" and even if he were comparable, plaintiff fails to come forward with any information demonstrating that a change in title from Facilities Engineer to Project Engineer would result in a salary increase. Accordingly, plaintiff fails to meet his initial burden of establishing a *prima facie* case on this failure to promote claim.

c.      Failure to Promote from Facilities Engineer to Project
Coordinator

In plaintiff's last failure to promote claim, he complains that although he was

transferred from the Facilities Department to the Records and Maps Department to

perform the job of fourth Project Coordinator in July 2001, he did not actually receive a

title change from Facilities Engineer to Project Coordinator until October 2001. (Pl.'s

Resp., at 21). Plaintiff argues that the three month delay in changing his title made him

ineligible for the salary increase allegedly accompanying his move from Facilities

Engineer to Project Coordinator. (Pl.'s Resp., at 21). Plaintiff also contends that even

when his title was finally changed to Project Coordinator in October 2001, "Ms.

Hechlinski simply decided not to give him any accompanying salary increase." (Pl.'s

Resp., at 21).

Defendants, in turn, argue that plaintiff's transfer from Facilities Engineer to

Project Coordinator was a purely lateral move and not a promotion. (Defs.' Summ. J.

Mem., at 14; *see also* Hechlinski Dep., at 35). As a lateral transfer, defendants note that

there was no accompanying pay increase. (Defs.' Summ. J. Mem., at 14; *see also*

Hechlinski Dep., at attachment "1" ("[Plaintiff's] job title and work location has been

changed with no pay increase.")). Thus, defendants assert that any delay in changing

plaintiff's title[22] did not actually materially affect him. (Defs.' Summ. J. Mem., at 14).

_____

[22] Defendants fully admit that, due to an oversight, an actual request to change
plaintiff's title from Facilities Engineer to Project Coordinator was not made until three
months after plaintiff's move into the Maps and Record Department took place. (Defs.'
Summ. J. Mem., at 14). However, the record makes clear that plaintiff was ultimately

Accordingly, defendants argue plaintiff "cannot establish that he was subjected to an adverse employment action with regard to his title and salary when he moved to the Maps and Record Department." (Defs.' Summ. J. Mem., at 14).

To establish that he suffered an adverse employment action as it relates to this particular failure to promote claim, plaintiff must show that his "compensation, fringe benefits, or other financial terms of employment [were] diminished . . ." or that "a nominally lateral transfer with no change in financial terms significantly reduce[d] [his] career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted . . ." *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (citations omitted).[23] Plaintiff does not show either. To begin with, plaintiff does not cite to or present *any* evidence – such as, for example, evidence comparing his salary as a Facilities Engineer to the general salary of a new Project Coordinator – which contradicts defendants' assertion that his move from Facilities Engineer to Project

---

given the appropriate title, and his personnel file properly reflects that plaintiff was actually made a Project Coordinator in July 2001. (Hechlinski Dep., at attachment "1" ([Plaintiff's] job title and work location has been changed with no pay increase. . . . Changes should be *retroactively effective* to 2001-07-01." (emphasis added)).

  [23] Although *Herrnreiter* describes an "adverse employment action" in the context of a Title VII action, that description nonetheless applies equally to actions brought under § 1981. *See Alexander v. Wis. Dep't of Health and Human Services,* 263 F.3d 673, 681-82 (7th Cir. 2001) (Section 1981 and Title VII claims are analyzed under the same rubric); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999) (noting that Seventh Circuit employs the same analytical framework to Title VII and § 1981 claims).

Coordinator was purely lateral and unaccompanied by a salary increase.[24] Instead, plaintiff attacks a statement made by Ms. Hechlinski in her deposition that plaintiff's transfer was lateral by arguing that the statement was based upon an erroneous assumption that plaintiff was transferring from a Facilities *Supervisor* position to Project Coordinator rather than from a Facilities *Engineer* position to Project Coordinator. (Pl.'s Resp., at 7 ¶ 33). Such an argument does little, in the end, to convince this court that plaintiff's move from Facilities Engineer to Project Coordinator was actually a promotion.

Up until now, plaintiff has focused each of his failure to promote arguments upon the idea that Ms. Hechlinski deliberately and wrongfully refused to change plaintiff's title from *Facilities Engineer* throughout his tenure at NIPSCO. Indeed, in plaintiff's other two failure to promote claims he argues, respectively, that: (1) Ms. Hechlinski wrongfully denied plaintiff a title change, and thus an accompanying raise, from his position as *Facilities Engineer* to Facilities Supervisor in December of 1998; and,

---

[24] Although plaintiff does not mention it, the court notes that in her deposition, Ms. Hechlinski admits that two of the other three Project Coordinators in the Maps and Records Department earned a higher salary than plaintiff. (Hechlinski Dep., at 47). However, the mere fact that two Project Coordinators earned a higher salary than plaintiff does not automatically confirm plaintiff's assertion that his personal and particular move from Facilities Engineer to Project Coordinator was something other than a lateral move (i.e., a "promotion"). Moreover, there is no evidence in the record which demonstrates that plaintiff was in any way comparable to those other Project Coordinators making a higher salary than him, and therefore that plaintiff was entitled to the same or a similar salary. In fact, the record shows that the other two Project Coordinators making more than plaintiff had approximately thirty years experience with NISPCO compared to plaintiff's ten. (Hechlinski Dep., at 47).

33

(2) in 2000, he was wrongfully denied a title change from *Facilities Engineer* to  Project Engineer during his stint at the Gary Pole Project. (*See* Pl.'s Resp., at 2 ¶ 14 & 20-21). Now plaintiff apparently wishes this court to believe that Ms. Hechlinski somehow forgot that she (allegedly) repeatedly and purposely forced plaintiff to maintain his title as Facilities Engineer, and instead just assumed plaintiff held some other title than Facilities Engineer before transferring him over to the Maps and Records Department. (Pl.'s Resp., at 7 ¶ 33). The court finds such a scenario unlikely.

More important than what is likely or unlikely however, is the fact that the testimony cited by plaintiff to demonstrate that Ms. Hechlinski "assumed" plaintiff to be a Facilities Supervisor at the time she made him Project Coordinator does not actually support the existence of such an assumption. (*See* Pl.'s Resp., at 7 ¶ 33 (citing to Hechlinski Dep., at 35)). In the portion of her deposition cited by plaintiff, Ms. Hechlinski is asked whether plaintiff "continued in his supervisory position over the mechanics" up until the time he transferred to the Maps and Records Department as Project Coordinator. (Hechlinski Dep., at 35). Ms. Hechlinski responds, "I think so – I'm not – I think so." (Hechlinski Dep., at 35). This testimony conveys nothing about Ms. Hechlinski's thoughts on plaintiff's title before he became Project Coordinator, it only expresses her understanding of his job duties.[25] And, in any event, only three pages after the deposition testimony cited by plaintiff to support his "assumption argument,"

---

[25] It is undisputed that plaintiff "supervised the mechanics" while holding the title of *Facilities Engineer*. (*See* Pl.'s Resp., at 2 ¶ 14, 5 ¶ 22, & 20).

Ms. Hechlinski quite clearly states that upon moving from the Facilities Department to the Maps and Records Department, plaintiff's title changed from Project Engineer (not Facilities Supervisor) to Project Coordinator. (Hechlinski Dep., at 38).

Ultimately, there is nothing in the record to support plaintiff's general assertion that his move from Facilities Engineer to Project Coordinator was a promotion accompanied by a salary increase. In fact, what evidence there is in the record concerning the transfer appears to support just the opposite conclusion – that plaintiff's transfer was lateral. Given then that the transfer was lateral, the fact that plaintiff did not receive a title change until three months after he actually began working as a Project Coordinator, does not appear to have *materially* affected plaintiff in any way. *See Herrnreiter*, 315 F.3d at 744 (one way for a plaintiff to demonstrate an adverse employment action is to show that his "compensation, fringe benefits, or other financial terms of employment [were] diminished . . ."). It does not appear to have affected him in any other way either as plaintiff does not allege, nor is there any evidence in the record which suggests, that the delay in plaintiff's title change had any impact upon his job skills, or that it injured his career in any way. *See id.* (a plaintiff can show adverse employment action by demonstrating that "a nominally lateral transfer with no change in financial terms significantly reduce[d] [his] career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted . . ."). Of course, the delay in receiving his appropriate title change may certainly have been displeasing to plaintiff, or even

35

inconvenient, but it does not, in this instance, rise to the level of an adverse employment action actionable under § 1981. *See Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004) ("Not everything that makes an employee unhappy qualifies as an adverse employment action . . ."); *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993) ("[A] materially adverse employment action under § 1981 is something "more disruptive than a mere inconvenience . . ."). Thus, plaintiff has failed to establish a *prima facie* case on this failure to promote claim.

C.     *Small Cubicle*

Finally, plaintiff complains that when transferred to the Maps and Records Department as Project Coordinator he was relegated to a " 'makeshift' cubicle, which was a small space also occupied by a large, noisy plotter, a piece of equipment that prints the drawings used by the records department." (Pl.'s Resp., at 21-22). Plaintiff states that his "makeshift" cubicle did not provide him with an adequate space to work and that the act of making him work in the smallest cubicle was an attempt to ensure that "[plaintiff] would fail wherever he went." (Pl.'s Resp., at 22). Defendants respond that temporary relegation to the smallest cubicle does not in-and-of-itself constitute an adverse employment action actionable under § 1981.

1.     *Prima Facie* Case

a.     Adverse Employment Action

As discussed in the previous section, an adverse employment action is "more than a mere inconvenience or an alteration of job responsibilities." *Crady*, 993 F.2d at

36

136. While an adverse employment action typically presents itself in the form of a "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities . . .," *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 465-66 (2002) (internal quotation marks and citation omitted), it nonetheless "can encompass other forms of adversity as well," *see Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987). Indeed, for example, a mere change in the conditions in which an employee works may also constitute an adverse employment action. *See Herrnreiter,* 315 F.3d at 744. However, in order to constitute an adverse employment action, the working conditions in which an employee works must be "changed in a way that subjects the employee to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment--an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet." *Id.* (citations omitted).

In the instant action, plaintiff certainly was not relegated to a closet when he transferred to the Maps and Records Department to act as a Project Coordinator, yet he was obliged, for approximately eight months, to work in a relatively small area and to share his workspace with both a support column and a large, noisy piece of equipment. (Pratt Dep., at 79, 97-98; *see also* Hechlinski Dep., at 40-41). According to plaintiff, not only did the small space, noise and constant squeezing past a column make for very uncomfortable and poor working conditions, it also humiliated him. (Pl.'s Resp., at 12

37

¶ 52; Pratt Dep., at 162-63). The evidence provided by plaintiff here demonstrates that his working conditions for at least eight months were, at the very least, unpleasant and a bit shabby. Such evidence, for purposes of this *prima facie* inquiry, demonstrates that plaintiff suffered an adverse employment action in being relegated to his small, "makeshift" cubicle for a significant period of time. *Cf. Collins*, 830 F.2d at 703-04. (adverse employment action included placing plaintiff at desk situated out in the open outside of her supervisor's office). Of course, this *prima facie* inquiry does not end with the finding that plaintiff suffered an adverse employment action as, in order to establish his *prima facie* case, plaintiff must also demonstrate that other similarly situated individuals outside plaintiff's protected class received more favorable treatment.

### b. Similarly Situated Persons

In the instant action, plaintiff *presumably* seeks to compare his treatment with that of the other three (non-minority) Project Coordinators, each of whom had larger cubicles than plaintiff and none of whom had to share their space with columns or noisy equipment. (*See* Hechlinski Dep., at 40). The court uses the term "presumably" here because plaintiff does not actually flesh out a similarly situated argument, he simply notes that he had the worst cubicle of all Project Coordinators. (Pl.'s Resp., at 21-23). Perhaps plaintiff believes that the mere fact that he shared the same title as the other Project Coordinators automatically makes him similarly situated to them. Yet, "[i]t is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-[minority] employees, the plaintiff must show that the 'comparables' are

38

similarly-situated *in all respects.*" *Spath v. Hayes Wheels Int'l-Ind., Inc.,* 211 F.3d 392, 397

(7th Cir. 2000) (citation omitted) (emphasis in original). Thus, in determining whether

plaintiff was similarly situated to his fellow Project Coordinators, this court may not

simply look at titles, but must review all factors relevant to context of this particular

case including, for example, the "experience, education, and qualifications" of the other

Project Coordinators compared to plaintiff. *See Radue v. Kimberly-Clark Corp.,* 219 F.3d

612, 617-18 (7th Cir. 2000).

Plaintiff offers no specific evidence to suggest that he bears any similarity to the

other Project Coordinators with respect to experience, education, or qualifications. Even

assuming that plaintiff was equal to the others in education, qualifications, etc., there

exists evidence in the record that the other three Project Coordinators were "established

in their positions before plaintiff arrived in the department." (Defs.' Summ. J. Mem., at

15). In other words, it seems that the other Project Coordinators had more seniority than

plaintiff, or more simply, they were in the Maps and Records Department first; plaintiff

does not dispute this. Accordingly, plaintiff cannot prove that his "comparables" were

similarly-situated "in all respects." *See Spath*, 211 F.3d at 397. Consequently, plaintiff has

failed to meet the similarly situated prong of a *prima facie* case as it relates to this

particular claim.

        2.     Pretext

Because plaintiff did not establish a *prima facie* case, this court need not proceed

to the pretext stage. *Coco,* 128 F.3d at 1179. Nevertheless, this court shall continue with a

pretext analysis simply for the purpose of making clear that, even assuming the existence of a *prima facie* case, the evidence in the record does not create genuine issues of material fact precluding summary judgment. Accordingly then, assuming that plaintiff carried his initial *prima facie* burden, the burden is now upon defendants to articulate a legitimate, nondiscriminatory reason for placing plaintiff in the smallest cubicle. *See Johnson,* 91 F.3d at 931.

Defendants explain that plaintiff was temporarily placed in a small cubicle because the office space in the Maps and Records Department "was not equipped . . . to fit another full-size cubicle" at the time plaintiff – the latest addition to the space – moved to the department. (Defs.' Summ. J. Mem., at 16). Indeed, defendants note that the Maps and Records Department was very crowded at the time plaintiff transferred positions as several bargaining unit members were housed there. (Defs.' Summ. J. Mem., at 16). Defendants further note that plaintiff was moved to a larger cubicle once the bargaining unit members were moved out of the department's space. (Defs.' Summ. J. Mem., at 16). Such reasons for temporarily placing plaintiff in a small cubicle constitute legitimate, non-discriminatory reasons for purposes of this portion of the court's *McDonnell Douglas* inquiry. *See Timm,* 32 F.3d at 275 ("[F]or a reason to be 'legitimate,' in the sense of sufficient to rebut a prima facie case, it need not be a good or sympathetic justification for what the employer did; it need only be nondiscriminatory and . . . explain why the challenged action was taken.").

Thus, the burden now rests upon plaintiff to demonstrate, by a preponderance of

40

the evidence, that the legitimate reasons offered by defendants were not the true reasons for their action, but were a pretext for discrimination. *See Johnson,* 91 F.3d at 931. As already noted in Section II(A)(2) of this order, plaintiff may make a showing of pretext "either directly by persuading the court that a discriminatory reason more likely motivated [defendants] or indirectly by showing that [defendants'] proffered explanation is unworthy of credence." *Weihaupt*, 874 F.2d at 428. Plaintiff lacks direct evidence of discriminatory motive on the part of defendants. However, in an attempt to demonstrate that defendants' reasons for placing him into a small cubicle are unworthy of credence, plaintiff takes issue with the fact that the space problem in the Maps and Records Department took nearly eight months to remedy. (Pl.'s Resp., at 22). Plaintiff notes that, "having worked as a Facilities Engineer where he was responsible for remodeling projects within the company, he knew that such a reconfiguration could have happened much more quickly if [defendants] had wanted it to happen." (Pl.'s Resp., at 22 (citing Pratt Dep. at 43-44, 146-47)).

Plaintiff's argument misses the point here. The timing of NIPSCO's space reconfiguration is irrelevant in as far as it does not in any way demonstrate that defendants' proffered reason for placing plaintiff in a small cubicle in the first place – that the department was overcrowded and not equipped for another full-size cubicle – is unworthy of credence (i.e., a lie). In fact, plaintiff's admission that the space needed to be reconfigured suggests that defendants' articulated reasons for placing plaintiff in a small cubicle are indeed legitimate. In any event, plaintiff's speculations on the timing

41

of the office reconfiguration and on the motive of defendants in taking eight months to provide plaintiff with a larger cubicle do not, without more, show pretext. *See First Fed. Sav. & Loan Ass'n*, 83 F.3d at 841-42 (subjective beliefs of plaintiffs are insufficient to create a genuine issue of material fact); *see also Weihaupt*, 874 F.2d at 429 (evidence consisting largely of plaintiff's own self-interested assertions and speculation as to motives of defendants was insufficient to show pretext.). As plaintiff has failed to cast doubt on defendants' proffered reason that it placed plaintiff in the smallest cubicle in the Maps and Records Department because, at the time plaintiff moved to the department, the over-crowded space was not equipped for another full-size cubicle, this court hereby grants defendants' motion for summary judgment on plaintiff's small cubicle claim.

## IV. CONCLUSION

Therefore, for the foregoing reasons, this court hereby **GRANTS** defendants' motion for summary judgment (docket # 34). The Clerk is directed to **ENTER FINAL JUDGMENT** in favor of defendants and against plaintiff. The court **VACATES** the Final Pretrial Conference and jury trial previously scheduled for April 28, 2005, and May 9, 2005, respectively.

**SO ORDERED.**

**Enter**: April 26, 2005

_____s/James T. Moody_____

JUDGE JAMES T. MOODY

UNITED STATES DISTRICT COURT